[No. 2391–2.   Division Two.   June 29, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. RICHARD L.
CHRISTENSEN, *Appellant.*

*Daniel J. Murray,* for appellant (appointed counsel for appeal).

*Jeremy Randolph, Prosecuting Attorney,* and *Joseph M. Mano, Jr., Deputy,* for respondent.

PETRIE, C.J.—The defendant, Richard L. Christensen, was convicted of first–degree burglary and second–degree assault. He was acquitted of a third count, that of tampering with a witness. The jury also returned special verdicts that defendant was (1) armed with a firearm, but (2) not armed with a deadly weapon when he committed the burglary, and was (3) armed with a firearm, and (4) armed with a deadly weapon when he assaulted his victim. Because of improper conversations between the jury and the bailiff, the trial judge struck all of the special verdicts. Because of the prejudicial nature of these conversations, however, we reverse the two general verdicts and the judgment based thereon.

At approximately 6 a.m. on November 22, 1975, defendant and one Jack Hill entered a mobile home in which Steve Hansen, the assault victim, and others were sleeping. Defendant claimed the two were invited in after knocking. He also testified that he intended to "talk" to Hansen because Hansen had punched one of defendant's friends in the aftermath of a party earlier that morning. Defendant acknowledged that he was angry and he grabbed Hansen "by the shoulder, by the neck, and jerked him out of bed" but denied that he punched Hansen. Hansen and another occupant who woke up during the affray contradicted this. They testified that first Christensen struck Hansen's face

more than once with his fist while Jack Hill trained a pistol on Hansen, and then Hill put down the gun and also hit and kicked Hansen. Hill then picked up the gun, pointed it at Hansen, and told him to put his shoes on because he was going with them to apologize to the man whom Hansen had hit earlier. Christensen and Hill, taking along one Wayne Hellem from the mobile home as a "witness," then drove Hansen to an apartment, where he made his apology. Defendant testified that neither he nor Hill was armed, and he also insisted that neither he nor Hill struck Hansen.

We first take up the dispositive issue of the conversations between bailiff and the jury after the jury had retired to deliberate. A bailiff is forbidden to communicate with the jury during its deliberations, except to inquire if they have reached a verdict. RCW 4.44.300. Obviously, the bailiff may make innocuous statements, for example, requesting the jurors to lower the volume of their discussion so it will not be overheard. *State v. Smith,* 43 Wn.2d 307, 261 P.2d 109 (1953). The statute is designed to insulate the jury from out–of–court communications that may prejudice their verdict. *O'Brien v. Seattle,* 52 Wn.2d 543, 327 P.2d 433 (1958); *State v. Moore,* 38 Wn.2d 118, 228 P.2d 137 (1951).

The trial court conducted a hearing after learning of these communications. The hearing followed the trial by more than a month, and memories of the jury foreman and bailiff were somewhat hazy. The foreman, Margaret Martin, testified that on three, perhaps four, occasions she knocked on the jury room door during deliberations to question the bailiff waiting outside. Her first request sought a transcript of the trial proceedings or, alternatively, a reading of the record to the jury. The bailiff properly told the jury that those requests could not be met. Between 9 and 10 p.m., Mrs. Martin requested "clarification on the legal points of our instructions to see if we could get them a little bit clearer." Rather than relaying this request to the judge, the bailiff admittedly took it upon himself to advise the jury that such a clarification would entail reconvening all the

courtroom principals—a procedure that could, in his words, take "hours"; Mrs. Martin recalled that the bailiff told her, "[T]hey didn't like to do it because of the time factor involved." In an earlier, written affidavit, Mrs. Martin said she had asked the bailiff during the second, or perhaps another contact, what would happen if the jury was unable to reach a verdict on all three counts, and was told that would mean a hung jury and a retrial on the unresolved counts. During the hearing, she could not remember asking that question. She did, however, recall a separate conversation, after the jury had determined defendant's guilt on the assault and burglary charges, when she asked what would happen if they could not agree on the special verdicts requested. She remembered the bailiff saying the defendant "would have to be retried on anything we couldn't reach a verdict on." The bailiff could not remember any questions about the jury's being unable to reach a verdict, or ever telling them a hung jury and a retrial would be the result.

Based on the testimony we have summarized, the court concluded that the improper comments of the bailiff had occurred after the jury had already reached their decisions of guilt or innocence on the substantive crimes, but that the *special* verdicts had been sufficiently tainted to require that they be stricken. The court entered no findings of fact. Having had the benefit of close study of the record, we are not convinced the *general* verdicts of guilt on the assault and burglary charges were not influenced by the bailiff's remarks.

The testimony and affidavits of the bailiff, and especially Mrs. Martin, are unclear and sometimes self-contradictory as to what was said and when. It is distinctly possible that his improper comments about the effects of a failure to agree and the impracticability of reconvening court to consider further instructions, did influence the jury's findings of guilt. The jury continued to deliberate for an hour or more after the last question. Moreover, while we approve of the court's effort to learn what had actually been said, *see O'Brien v. Seattle, supra* at 546, neither the

trial court nor we can consider a juror's statements as to *whether* the conversation with the bailiff influenced the jury; such effects inhere in the verdict and cannot be used to impeach it. *Gardner v. Malone,* 60 Wn.2d 836, 376 P.2d 651 (1962); *O'Brien v. Seattle, supra.* We can only attempt to discover *what* was said and examine the remarks for their possible prejudicial impact. After review of the entire record, we cannot say that we do not have any reasonable doubt that the bailiff's remarks had no prejudicial effect on the jury. Accordingly, the general verdicts must be reversed. *Gardner v. Malone, supra; O'Brien v. Seattle, supra.*

Although this matter must be remanded for a new trial, we examine defendant's other major contentions because he insists the evidence is insufficient to support his conviction of first–degree burglary and, accordingly, that charge should be dismissed. We disagree. RCW 9.19.010 (superseded effective July 1, 1976, by RCW 9A.52.020) recites the elements of the crime as follows:

> Every person who, with intent to commit some crime therein, shall enter in the nighttime, the dwelling house of another in which there shall be at the time a human being—
> (1) Being armed with a dangerous weapon; or
> (2) Arming himself therein with such a weapon; or
> (3) Being assisted by a confederate actually present; or
> (4) Who, while engaged in the nighttime in effecting such entrance, or in committing any crime in such building or in escaping therefrom, shall assault any person; or
> (5) Who, with intent to commit some crime therein, shall break and enter any bank, post office, railway express or railway mail car, shall be guilty of burglary in the first degree and shall be punished by imprisonment in the state penitentiary for not less than five years.

Specifically, defendant first argues there was no evidence the entry occurred in the nighttime. Evidence in the record indicates that entry occurred at approximately 6 a.m. and that, in late November, it was dark outside. RCW 9.01.010(19) defined "nighttime" to include the period

between sunset and sunrise. The State showed that sunrise on the date of the act was between 7:24 a.m. and 7:44 a.m. The State proved this element of the crime.[1]

Defendant further contends there was no evidence his entry was unlawful or that he intended to commit a crime within the mobile home. The elements of a crime can be proven circumstantially, and a challenge to the sufficiency of the State's evidence admits the truth of that evidence and all reasonable inferences that can be drawn therefrom, requiring us to interpret the evidence most strongly against the defendant and favorably to the State. *State v. Thompson,* 88 Wn.2d 13, 16, 558 P.2d 202 (1977). Here, the jury could have believed the prosecution's evidence that all of the mobile home's occupants were sleeping when defendant entered, and that none of them admitted him. Moreover, RCW 9.19.010 requires simply an entry, not an unlawful entry, except as the entry becomes unlawful by reason of the criminal intent of the person entering. *See State v. Gregor,* 11 Wn. App. 95, 521 P.2d 960 (1974). Defendant admitted that he entered the dwelling and went there because of his anger with Steve Hansen. The State's evidence indicates that Christensen struck Hansen in the face while his confederate pointed a gun at the victim. The jury could have reasonably inferred, therefore, that Christensen entered the mobile home with the intent to commit an assault therein. There was no failure of proof.

Judgment is reversed and the cause remanded for a new trial.

PEARSON and REED, JJ., concur.

---

[1]RCW 9A.52.020 no longer requires a nocturnal entry as an element of first-degree burglary.